**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., SCOTT M. ROSS, M.D., <br><br> vs. <br><br> FAMILY DERMATOLOGY OF PENNSYLVANIA, P.C., PAULA NELSON, M.D., FAMILY DERMATOLOGY, P.C., PAULA NELSON, M.D., d/b/a NELSON DERMATOPATHOLOGY AND PATHOLOGY LABORATORY; DATABASED, INC., YINKA ADESOKAN, FAMILY DERMATOLOGY MANAGEMENT, INC.; FAMILY DERMATOLOGY MANAGEMENT OF NORTH CAROLINA, LLC. | **0 9    5 7 5 2** <br><br> CIVIL ACTION NO. _____ <br><br> **FILED UNDER SEAL** <br><br> **[FALSE CLAIMS ACT –QUI TAM]** <br><br> **JURY DEMAND IS MADE** |

**QUI TAM COMPLAINT**

**COMES NOW**, SCOTT M. ROSS, M.D.,, ("Relator") in the above-styled action, by and through his counsel of record, PIETRAGALLO, GORDON, ALFANO, BOSICK AND RASPANTI, LLP, and WILBANKS & BRIDGES, LLP, and states that this is an action brought on behalf of the United States of America by Relator against FAMILY DERMATOLOGY OF PENNSYLVANIA, P.C., PAULA NELSON, M.D., FAMILY DERMATOLOGY, P.C., PAULA NELSON, M.D., d/b/a NELSON DERMATOPATHOLOGY AND PATHOLOGY LABORATORY; DATABASED, INC., YINKA ADESOKAN, FAMILY DERMATOLOGY MANAGEMENT, INC.; and FAMILY DERMATOLOGY MANAGEMENT OF NORTH CAROLINA, LLC., pursuant to the Qui Tam provisions of the Civil False Claims Act, 31 U.S.C. § 3729-33.

## I.   INTRODUCTION

1.      Qui Tam Relator Scott M. Ross, M.D. ("Ross" or "Relator") brings this action on his own behalf and on behalf of the United States of America to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, against Defendants, Family Dermatology Of Pennsylvania, P.C., Paula Nelson, M.D. ("Nelson"), Family Dermatology, P.C., Paula Nelson, M.D., D/B/A Nelson Dermatopathology And Pathology Laboratory ("Nelson Dermatopathology Laboratory"); Databased, Inc. ("Databased"), Yinka Adesokan ("Adesokan"), Family Dermatology Management, Inc; and Family Dermatology Management Of North Carolina, LLC (collectively referred to as "Defendants").

2.      Relator's allegations relate to illegal self-referral and kickback arrangements designed and orchestrated by Defendants, beginning on or before January 1, 2003, for the purpose of directing to themselves and their various businesses lucrative referrals of patients insured by the Medicare and Medicaid programs.

3.      Defendants illegal self-referral and kickback arrangements include, but are not limited to, a carefully orchestrated scheme wherein Defendants Family Dermatology, P.C., Paula Nelson and Yinka Adesokan would: (1) purchase small dermatology practices from dermatologists across the United States, (2) hire those dermatologists to stay-on as independent contractors; and (3) mandate that these dermatologists employed by, or contracting with, Family Dermatology (which was owned by Defendant Paula Nelson, M.D.) refer and direct all pathology work to Nelson Dermatopathology and Pathology Laboratory (which also was owned by Defendant Paula Nelson, M.D.).

2

4. Physicians who refused, or questioned whether it was legal, to refer all their patients' pathology work to Nelson Dermatopathology and Pathology Laboratory were terminated from future employment with Family Dermatology practices, lost substantial income, or were otherwise targeted for retaliation.

5. Referrals by any of the Family Dermatology practices, or any of its physician employees or independent contractors, to Nelson Dermatopathology and Pathology Laboratory violated the Stark Law and the federal Anti-Kickback Statute.

6. Defendants Paula Nelson and Yinka Adesokan also utilized their company Defendant Databased, Inc., as another means to illegally induce referrals of patients insured by the Medicare and Medicaid programs to Nelson Dermatopathology and Pathology Laboratory.

7. Databased, Inc. sells a comprehensive practice management and electronic medical records system tailored especially to dermatology practices. As part of the scheme of Nelson and Adesokan to receive lucrative referrals for dermatopathology services, Databased would offer its comprehensive practice management and electronic records to dermatology practices across the United States at a steep discount. After a few months, once those dermatology practices became dependent on the Databased practice management and records system, Adesokan would threaten to increase the price of that system by 85% unless they agreed to refer all of their dermatopathology work to Nelson Dermatopathology and Pathology Laboratory. Dermatology practices that referred their dermatopathology work to Nelson Dermatopathology and Pathology Laboratory continued to enjoy the discounted price for the use of the Databased practice management and records system.

3

8.      Referrals by any of the dermatology practices using the Databased, Inc. practice management and records system to Nelson Dermatopathology and Pathology Laboratory violated the federal Anti-Kickback Statute.

9.      Defendants also have, since at least January 1, 2003, violated the federal False Claims Act (federal FCA), 31 U.S.C. § 3729 et seq.  Knowing that they were ineligible for the payments demanded due to violations of federal and state anti-kickback statutes, and due to violations of the Stark Law, these Defendants submitted, or caused to be submitted, claims for reimbursement to Medicare, Medicaid, and other federal and state health care programs related to these illegal patient referrals, and they created or used false records in support of these false claims.

10.     All Defendants participated in the illegal kickback scheme, and so violated the federal FCA, 31 U.S.C. § 3729(a)(3), by conspiring to defraud the federal government by getting false or fraudulent claims allowed or paid by Medicare, Medicaid, and other federal and/or state funded health programs.

## II.    JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and 3730(b).  This Court has jurisdiction to entertain a qui tam action. Relator is an "original source" and otherwise authorized to maintain this action in the name of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. § 3729-33.

4

12.     Relator has made voluntary disclosures to the United States Government prior to the filing of this lawsuit and has filed a Disclosure Statement with the United States Government as required by 31 U.S.C. § 3730(b)(2)

13.     Venue is appropriate as to each Defendant, in that one or more of Defendants can be found in, reside in, and/or transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

## III.    THE PARTIES

14.     The Qui Tam Relator is SCOTT M. ROSS, M.D. ("Relator" or "Ross"). He is a resident of the State of Minnesota. Relator Ross is a Board Certified dermatologist, licensed in the states of Minnesota and Arizona. He has a private dermatology practice in Minneapolis, Minnesota. He has personal and independent knowledge of the factual allegations contained in this complaint and brings this action as an "original source".

15.     DEFENDANT FAMILY DERMATOLOGY OF PENNSYLVANIA, P.C., is a Pennsylvania professional medical corporation, owned and operated by its sole shareholder, DEFENDANT PAULA NELSON, M.D. Its president is DEFENDANT PAULA NELSON, whose address is listed with the State of Pennsylvania at 1803 Pine Street, Philadelphia, Pennsylvania 19103. Its registered agent is National Registered Agents, Inc. upon whom service can be made is at 600 N. 2d Street, Harrisburg, Pennsylvania 17101.

5

16.     DEFENDANT FAMILY DERMATOLOGY OF PENNSYLVANIA,

P.C.,   owns and operates the following 15 Family Dermatology practices within

Pennsylvania:

- Family Dermatology of Bala Cynwyd

- Family Dermatology of Bustleton

- Family Dermatology of Hazleton

- Family Dermatology of Laurys Station

- Family Dermatology of New Hope

- Family Dermatology of Norristown

- Family Dermatology of Reading

- Family Dermatology Roosevelt Boulevard

- Family Dermatology of Roxborough

- Family Dermatology of Sellersville

- Family Dermatology of Somerton

- Family Dermatology of Wyndmoor

- Family Dermatology of Uniontown

17.     Defendant PAULA NELSON, M.D. ("Nelson") is a resident of Lilburn,

Georgia. She is a licensed and Board Certified dermatologist and dermatopathologist in

the State of Georgia and other states. She is the sole shareholder and CEO of Defendant

FAMILY DERMATOLOGY, P.C. Defendant Nelson also operates a pathology

laboratory under the business name "NELSON DERMATOPATHOLOGY AND

PATHOLOGY LABORATORY", located in Lilburn, Georgia.

6

18.     DEFENDANT FAMILY DERMATOLOGY, P.C. is a Georgia professional medical corporation located at 629 Beaver Ruin Road NW, Suite B, Lilburn, Georgia 30047. The registered agent for service of process of said defendant is YINKA ADESOKAN, at the above address in Lilburn, Georgia. Defendant Family Dermatology, P.C. is also registered with the States of North Carolina and South Carolina as a foreign corporation.

19.     DEFENDANT FAMILY DERMATOLOGY, P.C. owns and operates the following 19 Family Dermatology practices within Georgia:

- Family Dermatology of Athens

- Family Dermatology of Atlanta – St. Joseph

- Family Dermatology of Atlanta – Northside

- Family Dermatology of Cartersville

- Family Dermatology of Conyers

- Family Dermatology of Conyers – Milstead

- Family Dermatology of Conyers – Rockdale

- Family Dermatology of Douglasville

- Family Dermatology of Dunwoody

- Family Dermatology of East Point

- Family Dermatology of Fayetteville

- Family Dermatology of Lilburn

- Family Dermatology of Marietta

- Family Dermatology of Peachtree City

- Family Dermatology of Norcross

7

- Family Dermatology of Rome – Redmond

- Family Dermatology of Rome

- Family Dermatology of Sandy Springs

- Family Dermatology of Smyrna

20.     DEFENDANT FAMILY DERMATOLOGY, P.C. owns and operates the following 2 Family Dermatology practices within North Carolina:

- Family Dermatology of Wilmington

- Family Dermatology of Rocky Point

21.     DEFENDANT FAMILY DERMATOLOGY, P.C. owns and operates the following Family Dermatology practice within South Carolina: Family Dermatology of Hilton Head.

22.     DEFENDANT YINKA ADESOKAN ("Adesokan") is a resident of Lilburn, Georgia. Said defendant is the husband of DEFENDANT PAULA NELSON. He is CEO of DEFENDANT FAMILY DERMATOLOGY, P.C. He also holds the positions of CFO and CEO for DEFENDANT DATABASED, INC. AND DEFENDANT FAMILY DERMATOLOGY MANAGEMENT, INC.

23.     DEFENDANT DATABASED INC. ("Databased") is a Georgia for profit corporation, whose principal office is located at 629 Beaver Ruin Road, Suite B, Lilburn, Georgia 30047. The registered agent for service of process of said defendant is YINKA ADESOKAN, at the above address in Lilburn, Georgia.

24.     DEFENDANT FAMILY DERMATOLOGY MANAGEMENT, INC. is a Georgia for profit corporation, whose principal office is located at 629 Beaver Ruin

8

Road, Suite B, Lilburn, Georgia 30047. The registered agent for service of process of said defendant is YINKA ADESOKAN, at the above address in Lilburn, Georgia.

25.    Defendant FAMILY DERMATOLOGY MANAGEMENT OF NORTH CAROLINA, LLC., is a North Carolina for profit limited liability corporation, whose principal office is located at 319 South Sharon Amity Road, Suite 230, Charlotte, North Carolina 28211. The registered agent for service of process of said defendant is Marc R. Gordon, at the above address in Charlotte, North Carolina.

## IV.    Background on Federal Health Care Programs

26.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

27.    Medicare has two parts: Part A, the Basic Plan of Hospital Insurance; and Part B, which covers physicians' services and certain other medical services not covered by Part A.

28.    Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

29.    Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care. It also covers some other medical services that Part A doesn't cover (i.e.,

9

physical and occupational therapist services, etc.). Part B helps pay for covered health services and supplies when they are medically necessary.

30. Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

31. The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

32. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

33. Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with rules developed by the Health Care Financing Administration ("HCFA").

34. Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

35. The principal function of both intermediaries and carriers is to make and audit payments for Medicare services to assure that federal funds are spent properly.

36.     To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

## V.  THE APPLICABLE LAW

### A.     Stark Law – Overview

37.     Under Stark law, a physician has a *financial relationship* with an entity if he has either an ownership (or investment) interest in the entity or a compensation arrangement with the entity.  42 U.S.C. §1395nn(a)(2).  An ownership or investment interest in the entity may be an equity interest, a debt relationship or indirect ownership through controlling entities.

38.     A "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and the entity.  42 U.S.C. §1395nn(h)(1)(A).  Stark law defines "remuneration" broadly to include any remuneration received by a physician directly or indirectly, overtly or covertly, in cash or in kind.  42 U.S.C. §1395nn(h)(1)(B).  Stark law excludes from the definition of "compensation arrangement" certain arrangements involving only remuneration consisting of:

- Forgiveness of amounts owed for inaccurate or mistakenly performed tests or procedures, or the correction of minor billing errors;

- Provision of items, devices, or supplies that are used solely to collect specimens or order procedures for entity; and

11

- Certain payments from insurers to physicians on a fee-for-service basis. 42 U.S.C. § 1395nn(h)(1)(A) and (C).

39.     As originally adopted in 1989, Stark law applied only to physician referrals to clinical laboratories in which they had a financial interest.   Congress significantly expanded the scope of the referral prohibition in 1993.   Stark law now prohibits referrals for "designated health services," which include clinical laboratory, physical therapy, occupational therapy, radiology, radiation therapy, durable medical equipment and supplies, home health, outpatient prescription drugs, and all inpatient and outpatient hospital services. 42 U.S.C. §1395nn(h)(6).

- Forgiveness of amounts owed for inaccurate or mistakenly performed tests or procedures, or the correction of minor billing errors;

- Provision of items, devices, or supplies that are used solely to collect specimens or order procedures for the entity; and

- Certain payments from insurers to physicians on a fee-for-service basis. 42 U.S.C. §1395nn(h)(1)(A) and (C).

40.     In contrast to the Federal Anti-Kickback Statute, Stark law is only a civil prohibition. A Stark law violation is not a crime in and of itself. However, a violation of Stark law may also constitute a violation of other applicable statutes, which could result in a criminal prosecution. Stark law is a strict liability statute that is violated whenever a prohibited referral is made or a claim is submitted based on that prohibited referral, regardless of whether the health care provider intended, knew or should have known that the law prohibited the actions it took.

41.     As of January 1, 1995, Stark law legislation applied to patient referrals by

12

physicians with a prohibited financial relationship for the "designated health services, which included inpatient and outpatient hospital services. See 42 U.S.C. §1395(h)(6); 42 U.S.C. §1395nn.

42. Stark law broadly defines what are prohibited financial relationships, to include any "compensation" paid directly or indirectly to a referring physician.

43. Unless an exception applies, a physician cannot refer, and an entity receiving a prohibited referral is prohibited from billing Medicare for the services. Qualifying as a group practice under Stark law is not itself an exception, but it enables physicians to be eligible for certain exceptions to the ownership and compensation arrangement prohibitions.

44. Stark law defines a group practice as follows: "The term 'group practice' means a group of 2 or more physicians legally organized as a partnership, professional corporation, foundation, not-for-profit corporation, faculty practice plan, or similar association." To be a valid group practice under Stark law, the group practice must meet six elements: (i) each physician-member performs the full range of services that he/she routinely provides; (ii) the physician-member services are billed under a billing number assigned to the group; (3) overhead expenses and income are predetermined by the group; (4) no physician-member directly or indirectly receives compensation based on the volume or value of the referrals by the physician; (5) physician-members each conduct at least 75-percent of the physician-patient encounters; and (6) meets other applicable standards imposed by regulation. 42 U.S.C. § 1395nn (h)(4). Moreover, a group practice operating in more than one state is considered a single legal entity only if: (1) the states in which the group are operating are contiguous; (2) the legal entities are

13

absolutely identical as to ownership, governance and operation, and (3) the organization into multiple entities is necessary to comply with state licensing laws.

45.     A group of physicians cannot provide "designated health services", including clinical laboratory, within the practice unless it qualifies as a group practice and meets the in-office ancillary services exception.

### B.     Federal Anti-Kickback Act ("AKA") – Overview

46.     The Federal Anti-Kickback Act makes it a crime to knowingly and willfully offer, pay, solicit or receive **any remuneration** to induce a person:

(1)     to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

(2)     to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. §1320a-7b(b)(1) and (2).

47.     The term "**any remuneration**" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. §1320a-7b(b)(1). Any ownership interest or compensation arrangement that constitutes a financial relationship under Stark would also constitute remuneration as defined by the AKA, unless a kickback safe harbor applies.

48.     Knowing and willful conduct is a necessary element of this criminal offense. 42 U.S.C. §1320a-7b(b)(1). An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks,* 157 F.3d 833, 837-8 (11th Cir. 1998). The statute has been interpreted to cover any

14

arrangement where <u>one</u> purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985). Violation of the statute constitutes a felony punishable by a maximum fine of \$25,000, imprisonment up to five years, or both. Any party convicted under the AKA *must* be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the AKA, the Secretary may exclude the provider from the Federal health care programs for a discretionary period, and may impose administrative sanctions of \$50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

49.     HHS has published safe harbor regulations that define practices that are not subject to the anti-kickback statute because such practices would unlikely result in fraud or abuse. *See* 42 C.F.R. §1001.952. The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor. As will hereafter appear, Defendants have failed to comply with the required conditions to qualify for such safe harbor protections.

**C.     The False Claims Act – Overview**

50.     Title 31 USCA Section 3729 of the Federal False Claims Act provides as follows:

*"(a) Liability for Certain Acts-*

15

(1) IN GENERAL- Subject to paragraph (2), any person who—

    (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    (C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

    (D)    has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

    (E)    is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

    (F)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

    (G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

    (2)    REDUCED DAMAGES- If the court finds that—

(A)     *the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;*

(B)     *such person fully cooperated with any Government investigation of such violation; and*

(C)     *at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation, the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.*

(3) *COSTS OF CIVIL ACTIONS- A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.*

## VI.    ALLEGATIONS

### A.    Background of Defendants' Operations

51.     On or about November 18, 1997, Defendants Paul Nelson and Yinka Adesokan formed Defendant Family Dermatology, P.C., a Georgia professional corporation, which operated dermatology practice(s) in the area surrounding Atlanta, Georgia.

52.     Defendants Nelson and Adesokan quickly grew the operations of Family Dermatology, P.C., by purchasing other dermatology practices in Georgia, Pennsylvania, North Carolina, and South Carolina.  Defendants Nelson and Adesokan would then

operate these dermatology practices under the "Family Dermatology" label.

53.     Defendants Nelson and Adesokan formed various corporate entities within Pennsylvania, North Carolina, and South Carolina for the purpose of owning and operating the dermatology practices they acquired in those states. These corporations included, but were not limited to: Defendant Family Dermatology of Pennsylvania, P.C., and Family Dermatology Management of North Carolina, P.C.

54.     Defendant Nelson is the Chief Executive Office of Defendant Family Dermatology, P.C., President of Defendant Family Dermatology of Pennsylvania, P.C., and the Secretary of Defendant Family Dermatology Management, Inc.

55.     Defendant Adesokan, who is the husband of Defendant Nelson, is the Chief Financial Officer and Secretary of Defendant Family Dermatology, P.C., and the Chief Executive Officer and Chief Financial Officer of Defendant Family Dermatology Management, Inc.

56.     After purchasing a dermatology practice, Defendants Family Dermatology, P.C., Nelson and Adesokan Family Dermatology, P.C., Nelson and Adesokan would hire the dermatologist who sold them the practice to stay-on and continue to work for them as an independent contractor.     Defendants Family Dermatology, P.C., Nelson and Adesokan would pay these independent contractor physicians a salary that represented a percentage of the "net collections" by the Family Dermatology practice where they worked.

57.     Utilizing this model, Defendants Family Dermatology, P.C., Nelson and Adesokan rapidly grew their business to owning and operating 35 dermatology practices in Georgia, Pennsylvania, North Carolina, and South Carolina.

18

58.     In addition to Family Dermatology business, Defendant Nelson also operates a thriving dermatopathology practice, doing business under the name Nelson Dermatopathology and Pathology Laboratory.

59.     Nelson Dermatopathology and Pathology Laboratory operates out of two laboratories in Georgia: one located at 755 Mount Vernon Highway, Suite 250, Atlanta, Georgia; and another located in the basement of Nelson's home.

60.     The 755 Mount Vernon Highway location of Nelson Dermatopathology and Pathology Laboratory is within the same building as the Atlanta-Northside location of Defendant Family Dermatology, P.C.

61.     Nelson Dermatopathology and Pathology Laboratory utilizes the services of at least two dermatopathologists, Defendant Nelson and Li Ma, M.D., Ph.D.

62.     In addition to his role with Family Dermatology, Defendant Adesokan is also the CEO of Defendant Databased, Inc., a Georgia for profit corporation.  Defendant Databased, formed in December 1998, sells a comprehensive practice management and electronic medical records system tailored especially to dermatology practices.

63.     Defendant Family Dermatology, P.C., and the 35 Family Dermatology practices in Georgia, Pennsylvania, North Carolina, and South Carolina, use the Databased practice management and electronic medical records system.

64.     Defendant Databased also sells its comprehensive practice management and electronic medical records system to dermatology practices across the United States that are not owned by Defendant Family Dermatology, P.C., and/or Defendant Nelson.

**B.     Defendants Nelson and Adesokan Illegally Direct Lucrative Referrals of Dermatopathology Services to Nelson Dermatopathology**

65.     Defendants have engaged in a scheme to illegally direct lucrative referrals

19

of dermatopathology services, including services paid for by Medicare and Medicaid, to Nelson Dermatopathology, the pathology laboratory owned and operated by Defendant Paula Nelson.

66.     Defendants scheme of directing dermatopathology referrals to Nelson dermatopathology included, but was not limited to, the following: (1) Mandating that the 35 Family Dermatology practices across the United States refer all of their dermatopathology work to Nelson Dermatopathology; and (2) Mandating that all dermatology practices that utilize the Databased comprehensive practice management and electronic medical records system refer all of their dermatopathology work to Nelson Dermatopathology.

### i. Defendants Illegally Mandate that all Family Dermatology Physicians Refer Pathology Services to Nelson Dermatopathology

67.     Defendants Nelson and Adesokan utilized their respective ownership and leadership positions position within Defendants Family Dermatology, P.C., Family Dermatology of Pennsylvania, P.C., Family Dermatology Management, Inc., and Family Dermatology Management of North Carolina, LLC, to require that dermatologists employed at any of the 35 Family Dermatology practices refer all of their dermatopathology services to Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

68.     Dermatologists, such as Relator Ross, who either refused to refer all of their patients to Nelson Dermatopathology and Pathology Laboratory, or questioned the legality of such an obvious self-referral by Defendants Nelson and Adesokan, were either terminated or faced other forms of retaliation, including the cancelation of the sale of

20

their dermatology practice to Family Dermatology.

69.     Defendants have utilized this scheme to direct the referral of thousands of dermatopathology services, including many paid for by Medicare and Medicaid, to Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

70.     Each and every referral by a Family Dermatology physician of dermatopathology services that were paid for by Medicare and/or Medicaid violates the Stark Law, because Defendant Nelson, and her husband (Defendant Adesokan), are mandating such referrals to Defendant Nelson's own dermatopathology laboratory.

71.     None of the exceptions to the Stark Law apply to Defendants' conduct as alleged in this Qui Tam Complaint.

72.     Each and every referral by a Family Dermatology physician of dermatopathology services that were paid for by Medicare and/or Medicaid violates the federal Anti-kickback Statute, because Defendants paid the referring independent contractor physicians substantial sums of money (in the form of a salary and the purchase money for their dermatology practice) to induce them to refer dermatopathology services to Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

73.     None of the safeharbors to the Anti-Kickback Statute apply to Defendants' conduct as alleged in this Qui Tam Complaint.

## ii. Defendants Illegally Mandate that all Dermatologists Utilizing Defendant Databased's Practice Management System Refer Pathology Services to Nelson Dermatopathology

74.     Defendants have also illegally mandated that all dermatology practices that utilize Defendant Databased's Practice Management and Electronic Medical Records System, including those not owned by Family Dermatology, refer all of their

21

dermatopathology work to Nelson Dermatopathology.

75. Defendant Databased offers its Practice Management and Electronic Medical Records System to dermatology practices across the country at a steep discount, which in some cases is approximately 85% less than the true retail price of that system.

76. As a result of this steep discount, Defendant Databased has, upon information and belief, been successful in getting numerous dermatology practices, not owned by Family Dermatology, to use its Practice Management and Electronic Medical Records System.

77. After a few months, once these dermatology practices have become completely reliant upon Defendant Databased's Practice Management and Electronic Medical Records System, Defendant Adesokan would inform these practices that the price for continuing to use the Databased system will immediately increase by 85% unless they agree to refer their pathology services to Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

78. Defendant Adesokan explained the price increase to one dermatology in a January 4, 2007 email by stating that Databased's "associated Laboratory Nelson Dermatopathology" has renewed its commitment to "subsidize the use of this software for its customers by paying 85% of the cost." Adesokan also explained in that email that "this is for customers who send a good portion of their pathology to Nelson Dermatopathology Laboratory."

79. Dermatology practices that did not agree to send their pathology services to Defendant Nelson and Nelson Dermatopathology Laboratory had to either: (1) pay the new, 85% more-expensive rate for using the Databased system; (2) find another

22

pathology laboratory to pay 85% of the user fees for the Databased system; or (3) find another Practice Management and Electronic Medical Records System.

80.     Faced with the substantial disruption and loss of income that would result from losing access to the Databased system, many of the dermatology practices that utilized the Databased system, upon information and belief, agreed to Defendant Adesokan's demand to refer pathology services to Defendant Nelson and Nelson Dermatopathology Laboratory.

81.     Defendants have utilized this scheme to direct the referral of thousands of pathology services, including those paid for by Medicare and Medicaid, to Defendant Nelson and Nelson Dermatopathology Laboratory.

82.     Each and every referral of pathology services, paid for by Medicare and/or Medicaid, dermatology practices utilizing Defendant Databased's system and Nelson Dermatopathology Laboratory violates the Stark Law, because Defendants Adesokan and Nelson mandated and directed those referrals to Defendant Nelson's own dermatopathology laboratory.

83.     None of the exceptions to the Stark Law apply to Defendants' conduct as alleged in this Qui Tam Complaint.

84.     Each and every referral of pathology services, paid for by Medicare and/or Medicaid, from dermatology practices utilizing Defendant Databased's system to Nelson Dermatopathology Laboratory violates the federal Anti-kickback Statute, because Defendants paid the referring physicians substantial sums of money (in the form of the 85% discount of the price for using the Databased Practice Management and Electronic Medical Records System) to induce them to refer dermatopathology services to

Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

85.     None of the safeharbors to the Anti-Kickback Statute apply to Defendants' conduct as alleged in this Qui Tam Complaint.

## C.     Relator Ross' Discovery of Defendants' Illegal Self-Referrals, Kickbacks and False Claims

86.     In 2008, Defendant Adesokan approached Relator Ross in regards to purchasing Relator Ross's dermatology practice. The sale was negotiated and an Asset Purchase Agreement and Physician's Service Agreement were signed on May 1, 2008.

87.     According to the terms of the Asset Purchase Agreement, Defendant Family Dermatology, P.C. agreed to pay Relator Ross $450,000, in the form of a loan from Relator Ross to Family Dermatology, P.C., which was required to be repaid within four years, with an interest rate of 8% per annum.

88.     Defendants also hired Relator Ross as an independent contractor, to continue providing dermatology services at the purchased practice location on behalf of Defendants Nelson and Family Dermatology, P.C.

89.     Defendant Nelson and Relator Ross entered into a Professional Services Agreement, on or about May 1, 2008, memorializing Relator Ross' employment as an independent contractor for Family Dermatology. According to the terms of that Professional Services Agreement, Relator Ross was to compensated a base amount equal to 45% and up to 60% of his "net collections," as that term was defined in the agreement.

90.     Shortly after signing the Asset Purchase and Professional Services Agreements, Defendant Adesokan informed Relator Ross that he was required to refer all his pathology tests done as part of his practice to Defendant Nelson's pathology laboratory in Atlanta, Georgia. Relator Ross objected to this requirement.

24

91.     For many years, Relator Ross had sent his tests to a pathology laboratory that was located in close proximity to his office. Relator Ross believed that this practice saved time and money. Dr. Ross saw no need to abandon his historically effective practices in order to send his tests across the country to Defendant Adesokan's wife in Atlanta, Georgia. As of a result of this refusal and other disagreements, Defendants terminated the purchase of Relator Ross's practice, as well as his Professional Services Agreement.

92.     Relator made numerous inquiries regarding the purchases of other dermatology practices across the country by Defendant Nelson and discovered that the other selling physicians, after the sales of their medical practices, were also required to send all their pathology tests to Defendant Nelson's laboratory in Atlanta. Each of these physicians had entered into independent physician services agreements with Defendant Nelson.

93.     These selling physicians also had entered into similar independent contractor agreements to operate the physician practices on behalf of Defendant Nelson. The physician services agreement provided that the selling physician would receive as base compensation a percentage of the gross revenues of the sold practice, with a bonus for increase in gross revenues. These compensation arrangements were individualized as to each practice with regard to revenue and expenses and were not pooled as a group with the other affiliated dermatology practices of Defendant Nelson.

94.     Rather than obtain a Medicare or Medicaid group practice number for each of these purchased medical practices, Defendants had each physician practice continue to bill Medicare and Medicaid under their individual physician National

Physician Provider Numbers. However, the Defendants had payments remitted directly to Defendant Nelson in Atlanta, Georgia.

95. Medicare and Medicaid were not billed by these purchased dermatology practices under a group provider number as required as a prerequisite to lawfully qualify as a "group practice".

96. The affiliated and owned satellite offices of Defendant Nelson fail to meet the clear and specific legal definition of a "group practice" under Stark law and therefore do not qualify for any relevant exception to Stark law.. Thus, the referrals described above from the purchased practices to Defendant Nelson's laboratory constitute a prohibited referral arrangement under the Stark laws cited herein.

**COUNT ONE**
**VIOLATION OF STARK STATUTE**
**(42 U.S.C. §1395(nn) *et seq.*)**

97. Paragraphs 1 through 96 are incorporated into Count One as if fully set forth herein.

98. Defendants' conduct described herein constituted a violation of Stark law, 42 U.S.C. §1395(nn) *et seq.*

99. Defendants Nelson and Adesokan utilized their respective ownership and leadership positions position within Defendants Family Dermatology, P.C., Family Dermatology of Pennsylvania, P.C., Family Dermatology Management, Inc., and Family Dermatology Management of North Carolina, LLC, to require that all dermatologists employed at any of the 35 Family Dermatology practices refer all of their dermatopathology services to Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

100.    Each and every referral by a Family Dermatology physician of dermatopathology services that were paid for by Medicare and/or Medicaid violates the Stark Law, because Defendant Nelson, and her husband (Defendant Adesokan), are mandating such referrals to Defendant Nelson's own dermatopathology laboratory.

101.    Defendants have also illegally mandated that all dermatology practices that utilize Defendant Databased's Practice Management and Electronic Medical Records System, including those not owned by Family Dermatology, refer all of their dermatopathology work to Nelson Dermatopathology.

102.    Each and every referral of pathology services, paid for by Medicare and/or Medicaid, dermatology practices utilizing Defendant Databased's system and Nelson Dermatopathology Laboratory violates the Stark Law, because Defendants Adesokan and Nelson mandated and directed those referrals to Defendant Nelson's own dermatopathology laboratory.

103.    None of the exceptions to the Stark Law apply to Defendants' conduct as alleged in this Qui Tam Complaint.

104.    Defendants have intentionally and systematically billed the Government for services provided through prohibited referrals.

105.    Defendant's satellite offices do not qualify as a group practice under Stark law. Therefore, the Defendants are not eligible for any relevant exceptions to Stark law.

106.    Absent an exception, a group of physicians cannot provide or refer "designated health services", including clinical laboratory, within the practice.

107.    Defendants submitted claims to Medicare based on prohibited referrals and, in so doing, falsely certified compliance with Stark law.

27

108. The Stark law violations which occurred and continue to occur create strict liability for the Defendants. The violation of Stark law is not based on what the Defendants intended, knew or should have known. There is no scienter component of a Stark law violation.

WHEREFORE, Relator requests the following relief:

A. Judgment against the Defendants in an amount equal to a refund of all Medicare claims paid for DHS, that resulted from an illegal referral, pursuant to 42 U.S.C. § 1395nn(g)

B. Imposition of sanctions against Defendants, including denials of payments, and refunds of claims pursuant to 42 U.S.C. § 1395nn(g);

C. Imposition of penalties up to $15,000 for each Stark Law violation;

D. His attorneys' fees, costs, and expenses; and

E. Such other relief as the Court deems just and appropriate.

## COUNT TWO
## VIOLATION OF ANTI-KICKBACK ACT
### (42 U.S.C. §1320(a)-7(b) *et seq.*)

109. Paragraphs 1 through 108 are incorporated into Count Three as if fully set forth herein.

110. Defendants' conduct described herein constituted a violation of the Anti-Kickback Act, 42 U.S.C. § 1320(a)-7(b) *et seq.*

111. Each and every referral by a Family Dermatology physician of dermatopathology services that were paid for by Medicare and/or Medicaid violates the federal Anti-kickback Statute, because Defendants paid the referring independent contractor physicians substantial sums of money (in the form of a salary and the purchase

28

money for their dermatology practice) to induce them to refer dermatopathology services to Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

112. Each and every referral of pathology services, paid for by Medicare and/or Medicaid, dermatology practices utilizing Defendant Databased's system and Nelson Dermatopathology Laboratory violates the federal Anti-kickback Statute, because Defendants paid the referring physicians substantial sums of money (in the form of the 85% discount of the price for using the Databased Practice Management and Electronic Medical Records System) to induce them to refer dermatopathology services to Defendant Nelson and Nelson Dermatopathology and Pathology Laboratory.

113. None of the safeharbors to the Anti-Kickback Statute apply to Defendants' conduct as alleged in this Qui Tam Complaint.

114. The Federal Anti-Kickback Act makes it a crime to knowingly offer, pay, solicit or receive any remuneration to induce a person to refer a person for the furnishing of any service covered under a federal healthcare program.

115. Unlike the Stark law offence referenced above, knowing and willful conduct is a necessary element of the criminal kickback offense.

116. The providing of discounted services in exchange for illegal referrals as described previously in this Complaint constituted an illegal inducement for the Defendants. The same factual predicates giving rise to the Stark violation also constitute a violation of the Federal Anti-Kickback Act.

117. As a direct result of Defendants' conduct as alleged herein, Government payers, including Medicare and Medicaid, and the taxpayers of the United States have been directly damaged.

29

WHEREFORE, Relator requests the following relief:

A.    Judgment against the Defendants in an amount equal to up to three times

the amount of the improper remuneration at issue;

B.    Imposition of penalties of up to $50,000 for each kickback violation;

C.    His attorneys' fees, costs, and expenses;

D.    Such other relief as the Court deems just and appropriate.

## COUNT THREE
## VIOLATION OF THE FALSE CLAIMS ACT
## (31 U.S.C. §3729)

118.    Paragraphs 1 through 117 are incorporated into Count Three as if fully set
forth herein.

119.    Defendants' violations of the federal Anti-kickback Statute, as described
herein, give rise to liability under the federal False Claims Act.

120.    As a prerequisite to participating in federally-funded health care programs,
Defendants expressly certified (or, through their participation in a federally funded
program, impliedly certified) their compliance with the federal Anti-Kickback Statute.

121.    Defendants violated the federal False Claims Act by submitting claims, or
causing the submission of claims, for reimbursement from federal health care programs,
including Medicare and Medicaid, knowing that they were ineligible for the payments
demanded due to federal Anti-Kickback Statute violations.

122.    Defendants' violations of the Stark Law, as described herein, give rise to
liability under the federal False Claims Act.

123.    Defendants directed and mandated the referral of Medicare patients for
DHS to Defendant Nelson and Nelson Dermatopathology Laboratory, an entity with

30

which they had a financial relationship, in violation of the Stark Law, 42 U.S.C. § 1395nn.

124.    Claims submitted by Defendant Health System for Medicare funds that are tainted by the Defendants' Stark Law violations constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1).

125.    Defendants knowingly caused to be made or used false records or statements, including, i.e., the false certifications and representations of compliance with the federal Anti-Kickback Statute which Defendant caused to be made when it submitted the false claims for payment, the Medicare enrollment forms, to get false or fraudulent claims (those related to referrals tainted by violations of the federal Anti-Kickback statute and the Stark Law) paid or approved constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(2).

126.    Defendants, through their concerted efforts to direct the referral of lucrative pathology services to Defendant Nelson and Nelson Dermatopathology Laboratory, conspired to defraud the federal government by getting false or fraudulent claims (those related to referrals tainted by violations of the federal Anti-Kickback statute and the Stark Law) allowed or paid by the government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(3).

127.    All of the Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

WHEREFORE, Relators pray for judgment against Defendants as follows:

A.    Defendants be ordered to cease and desist from submitting and/or causing the submission of any more false claims or in any way from otherwise

31

violating 31 U.S.C. §3729 *et seq.*.

B. That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim and so multiplied as provided by 31 U.S.C. §3729(a), plus a civil penalty of not less than Five Thousand, Five Hundred ($5,500.00) Dollars nor more than Eleven Thousand ($11,000.00) Dollars per claim, as provided by 31 U.S.C. §3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants together with penalties for specific claims to be identified at trial after full discovery;

C. That Relators be awarded the maximum amount allowed pursuant to the Stark law, Anti-Kickback Act and False Claims Act as cited and referenced herein.

D. That judgment be granted for Relators and the United States and against Defendants for any costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit; and

E. That Relator and the United States be entitled to any and other relief that they are entitled to, whether by law or equity;

<u>Demand for Jury Trial</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, qui tam Plaintiff

hereby demands a trial by jury.

This __3rd__ day of December , 2009.

Respectfully submitted,

Pietragallo, Gordon, Alfano, Bosick & Raspanti, LLP

Counsel for Relator

Marc S. Raspanti, Esquire
Michael S. Morse, Esquire
PA Bar Nos. 41350; 80507
1818 Market Street,
Suite 3402
Philadelphia, PA 19103
Tel: (215) 988-1427 | Fax: (215) 981-0082
http://www.Pietragallo.com


WILBANKS & BRIDGES, LLP


By: _____/s/_____
       MARLAN B. WILBANKS
       Georgia Bar No. 758223
       Pro Hac Vice

By: _____/s/_____
       TYRONE M. BRIDGES
       Georgia Bar No. 081500
       Pro Hac Vice

       3414 Peachtree Road, NE
       Suite 1075
       Atlanta, Georgia  30326
       Tel: (404) 842-1075
       Fax: 404-842-1075
       mbw@wilbanks-bridgeslaw.com

1629962-v2

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Qui Tam Complaint

FILED UNDER SEAL has been served this date upon the following individuals in the

manner indicated below:

**VIA FEDERAL EXPRESS**

Honorable Eric Holder
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC  20530

Virginia Gibson
First Assistant U.S. Attorney
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Margaret Hutchinson
Chief, Civil Division
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

FILED

DEC 03 2009

MICHAEL E. KUNZ, Clerk
By_____ Dep Clerk

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

By: _____
MICHAEL A. MORSE, ESQUIRE
I.D. No.  80507
1818 Market Street, Suite 3402
Philadelphia, PA   19103
(215) 320-6200

Attorneys for Plaintiff Scott Ross, M.D.

Date:  December 3, 2009
1634681-